# In the United States Court of Federal Claims

**SYSTEM STUDIES & SIMULATION, INC.** *et al.*,

>*Plaintiffs,*

v.

**THE UNITED STATES,**

>*Defendant,*

**and**

**CAE USA INC.,**

>*Defendant-Intervenor.*

**Nos. 24-1429, 24-1467, 24-1496**
**(Filed Under Seal: February 12, 2025)**
**(Public Release: March 4, 2025)**

*W. Brad English, Emily J. Chancey, Michael R. Pillsbury, Taylor R. Holt,* and *Hunter M. Drake,* Maynard Nexsen, PC, Huntsville, Alabama, for Plaintiff System Studies & Simulation, Inc.

*Christopher L. Lockwood*, Womble Bond Dickinson (US) LLP, Huntsville, Alabama, for Plaintiff DigiFlight, Inc. *Jerome S. Gabig*, Government Procurement Lawyer, LLC, Guntersville, Alabama, of counsel.

*Anuj Vohra*, *Cherie J. Owen*, *Issac D. Schabes*, and *Roxanne N. Cassidy*, Crowell & Moring LLP, Washington, D.C., for Plaintiff Amentum Services, Inc.

*Kara M. Westercamp*, Senior Trial Counsel, *Corinne A. Niosi*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. *MAJ. Danielle C. Naser*, Trial Attorney, U.S. Army Legal Services Agency, Fort Belvoir, Virginia, of counsel.

*Alexander B. Ginsberg*, *Robert C. Starling*, and *Katherine L. St. Romain,* Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for Defendant-Intervenor CAE USA Inc.

## OPINION AND ORDER

**HADJI,** *Judge*.

This is a post-award bid protest arising from the U.S. Army's handling of an Advanced Helicopter Flight Training Support (AHFTS) Services Acquisition. Plaintiffs, three disappointed offerors, challenge the Army's alleged failure to conduct discussions, evaluation of proposals, and ultimate decision to award the AHFTS contract to CAE, Inc. (CAE or Intervenor). Before the Court are motions for judgment on the administrative record (MJAR) filed by Plaintiffs DigiFlight, Inc. (DigiFlight) (ECF 36), Amentum Services, Inc. (Amentum) (ECF 37), and System Studies & Simulation, Inc. (S3) (ECF 39). Also before the Court are Defendant's Cross-Motion for Judgment on the Administrative Record (Def.'s MJAR) (ECF 46), and Intervenor's Cross-Motion for Judgment on the Administrative Record and Motion for Partial Dismissal (Int.'s MJAR and MTD) (ECF 47).

For the reasons stated below, the Court **DENIES** DigiFlight's Motion for Judgment on the Administrative Record (ECF 36), **DENIES** Amentum's Motion for Judgment on the Administrative Record (ECF 37), **DENIES** S3's Motion for Judgment on the Administrative Record (ECF 39), **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF 46), and **GRANTS** Intervenor's Cross-Motion for Judgment on the Administrative Record and Motion for Partial Dismissal (ECF 47).[1]

## BACKGROUND

### I.    Procurement History

The procurement at issue involves the provision of flight training support services to the United States Army Aviation Center of Excellence (USAACE) at Fort Novosel, Alabama. AR 655. In May 2020, the Army awarded Contract No. W9124G-20-C-0008, a firm-fixed-price contract to CAE to provide flight instructors to train Army pilots operating the AH-64 Apache Longbow Helicopter, the UH-60 Black Hawk Helicopter, and the CH-47 Chinook Helicopter. AR 6, 192. The contract was valued at approximately $88 million, with an initial base period and option periods extending through December 9, 2027 (the 2020 CAE Contract). *See* AR 6-7, 192.

In September 2022, the Army increased the total value of the 2020 CAE Contract by $29 million to approximately $117 million; the increased amount was added to Option Periods 2, 3, and 4. AR 6-7. The Army explained that the contract modification was necessary because "[s]ince contract award, multiple global and macroeconomic events like the COVID-19 pandemic, airline pilot shortages, proliferation of the AH-64 platform to allied nations, missed Army retention goals, and overseas conflicts reduced the labor

---

[1] This Opinion was originally filed under seal on February 12, 2025. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. The proposed redactions were filed on February 26, 2025, ECF 68-1, and are accepted by the Court. The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, the corrected spelling of an attorney's name, and this footnote.

market to where this contract can no longer meet Government requirements." AR 7. Due to CAE's "difficulties recruiting and retaining qualified personnel at the labor rates provided for under the contract," the Army declined to exercise the final three option periods of the 2020 CAE Contract and instead elected to re-compete the requirement "to allow for additional flight instructors to be hired at potentially higher salaries to increase retention, maintain flight safety, and prevent having to reduce the number of students in flight instruction courses or potentially cancel entire sessions due to instructor shortages." AR 192. The Independent Government Cost Estimate (IGCE) for this effort estimated a total contract price of approximately ███████████████. AR 148.

## II.    The Solicitation

On March 4, 2024, the Army issued Solicitation No. W9124G-24-R-0001 (the Solicitation). AR 461-632. The Army twice amended the Solicitation. *See generally* AR 633-703; AR 704-20. The Solicitation contemplated award of a firm-fixed-price contract with a one-year base period (including a one-month phase in period) and four one-year option periods. AR 467-84.

### A.    Evaluation Criteria and Basis for Award

The Solicitation advised offerors that proposals would be evaluated on a best value trade-off basis using four evaluation factors: Factor 1 – Technical Capability; Factor 2 – Past Performance; Factor 3 – Small Business Participation; and Factor 4 – Price. AR 650.

Factor 1 (Technical Capability) was to assess "the offeror's Technical Capability to determine the offeror's understanding of and ability to perform the requirements of the Solicitation." *Id*. Factor 2 (Past Performance) was designed to "assess[] the degree of confidence the Government has in an offeror's ability to supply the services that meet the users' needs based on a demonstrated record of performance." AR 652. Factor 3 (Small Business Participation) evaluated the "level of proposed participation of small businesses" in each offeror's proposal. AR 653. For Factor 4 (Price), the Army would evaluate the total price (total evaluated price), which included all Contract Line Item Numbers (CLINs) for the base period and all options. AR 654. Additionally, the Army would determine if a proposed price was "fair and reasonable, balanced, and complete using price analysis techniques at FAR 15.404-1(b) and FAR 15.404-1(g)." *Id*.

The Solicitation provided that the Army would evaluate proposals under Factor 1 and Factor 3 using the following adjectival ratings: Outstanding, Good, Acceptable, Marginal, and Unacceptable. AR 650-51, 654. The Factor 1 ratings were to include consideration of risk in conjunction with offerors' strengths, weaknesses, and deficiencies. AR 650. An "Unacceptable" rating for Factor 1 was described as one in which the "[p]roposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high." AR 651. The Solicitation defined a deficiency as follows: "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level (See

FAR 15.001)." *Id*. For Factor 2 (Past Performance), the Solicitation provided the following adjectival ratings: Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, and No Confidence. AR 652.

The Solicitation explained the four factors would be weighed as follows:

> Factor 1 is significantly more important than Factors 2 and 3 (all other non-price factors). Factor 2 is significantly more important than Factor 3. Factors 1 through 3 (all non-price factors), when combined, are significantly more important than Factor 4 (Price). The greater the equality of proposals within the non-price factors, the more important price becomes in selecting the best value to the Government.

AR 650. To be eligible for award, an offer must be rated "Acceptable" or higher for Factor 1 and Factor 3, and a rating of "Neutral Confidence" or higher for Factor 2. *See* AR 649-652. The Solicitation further explained:

> An offeror shall be ineligible for award if (i) its proposal fails to comply with the material requirements of the solicitation … (ii) it proposes prices that are determined to be unreasonably high, unbalanced, incomplete, or inaccurate; (iii) its proposal receives a rating of 'Marginal' or 'Unacceptable' in Factor 1 or Factor 3; or (iv) its proposal receives a rating of 'Limited Confidence' or 'No Confidence' in Factor 2.

AR 649-50.

The Solicitation further advised that "[t]he Government intends to conduct discussions in accordance with DFARS § 215.306(c)(1)." AR 649. However, in the next immediate sentence, the Solicitation cautioned: "[h]owever, the Government may choose to award *without* discussions. Therefore, the offeror's initial proposal should contain the offeror's best terms from a price and technical standpoint." *Id*. (emphasis added). Elsewhere in the Solicitation, the Government incorporated FAR § 52.215-1, AR 485, which provides, in relevant part, as follows:

> The Government intends to evaluate proposals and award a contract *without discussions* with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions *if the Contracting Officer later determines them to be necessary*.

FAR § 52.215-1(f)(4) (emphases added).

In the general instructions, the Solicitation likewise emphasized the uncertainty of discussions. First, it reminded offerors that:

> [i]f an offeror believes that the requirements in these instructions contain an error, an ambiguity, omission, or are otherwise unsound, the offeror shall immediately notify the Contracting Officer in writing with supporting rationale. The offeror is reminded that the Government reserves the right to award this effort based on the initial proposal, as received, *without discussion*.

AR 709 (emphasis added). The Solicitation then explained that "[s]hould the Government open discussions, the acceptance period may be extended." *Id*. Finally, the Solicitation referenced different "submission requirements or discussion response instructions *if* discussions are opened." AR 710 (emphasis added).

B. The Performance Work Statement

As relevant here, in the Performance Work Statement (PWS), the Army set forth specific requirements related to staffing, readiness, and tasks. AR 655-71. For example, Section 1.5.9 established key personnel, to include a Program Manager (PM) and Alternate Program Manager (APM). AR 658. Both the PM and APM needed "a minimum of 4 years of experience in planning, directing, coordinating, monitoring, and managing contracts specifically related to aviation training programs." *Id*. The PWS also set forth experience requirements for other contract personnel, such as instructor pilots (IP), maintenance examiners (ME), and non-rated crew members (NRCM). AR 658-59. The PWS provided that contractor crew members were expected to meet the following medical readiness standards:

> 1.5.11 Medical Standards. Contractor crew members shall meet aviation medical requirements as described in AR 40-501 - Standards of Medical Fitness, paragraph 4-2. b. (4). Contractor pilots shall maintain a current annual Federal Aviation Administration (FAA) Second Class Medical Certificate through the duration of the contract or, if a member of the National Guard or Reserves, an Army Class 2 Flight Duty Medical Exam (FDME). Contractor NRCMs shall maintain a current FAA Third Class flight physical through the duration of the contract or, if a member of the National Guard or Reserves, a military Class 3 flight physical. Contract crew members shall enter the non-qualified workforce any time they are unable to medically maintain flight duty capabilities in the aircraft.

5

AR 659-60.

With respect to specific tasks, the PWS required contractors to provide flight training support for both aircrew and non-aircrew personnel. AR 668. The contractor needed to have the daily capability, Monday through Friday, to perform morning, afternoon, and night flight training, and the contractor could not exceed specified student-to-instructor or aircraft-to-instructor ratios. AR 668-69. In Section 5.4.3, the Army also explained that "[m]aintaining a consistent student capacity is vital to the Government to maintain class rosters and minimize disruptions of flight training," but recognized that some flexibility is necessary. AR 669. To that end, the Army advised offerors that it would accept some temporary student capacity variation (TSCV) and provided the maximum acceptable TSCV per training week. *Id*.

Section 5.4.6 contemplated surge requirements. *Id*. Contractors were required to have "additional capability" for surge staffing that would allow for the training of additional flight students. AR 669-70. For example, the Army required contractors to have daily training capability for up to 30 additional flight students in the AH-64 Apache Longbow Helicopter. AR 670.

The Solicitation required offerors to address, *inter alia*, their approaches to accomplishing the work and approach to mitigating risks in their submissions. AR 713. The Solicitation also required offerors to address their Staffing, Recruitment, and Retention plans within their Factor 1 submissions. *Id*.

## III.    Evaluation of the Offerors and Award

CAE, Amentum, DigiFlight, S3, and two other offerors submitted proposals in response to the Solicitation. AR 2768. The following table summarizes the Army's evaluation findings:

| Offeror | Ratings | | | | | | |
|---|---|---|---|---|---|---|---|
| | F1 – Tech Capability | F2-Past Performance | F3-Small Bus. Participation | F4 - Price | | | |
| | | | | Total Evaluated Price | Reasonable | Balanced | Comp. |
| Amentum Services, Inc. (Amentum) | Unacceptable | Satisfactory Confidence | Outstanding | $175,573,188.94 | Not Evaluated | Yes | Yes |
| CAE USA, Inc. (CAE) | Acceptable | Satisfactory Confidence | Outstanding | $202,049,993.50 | Yes | Yes | Yes |
| DigiFlight, Inc. (DigiFlight) | Unacceptable | Satisfactory Confidence | Outstanding | $232,358,491.35 | Not Evaluated | Yes | Yes |
| ███████████ | ███████ | ███████ | ███████ | ███████ | ███████ | ███ | ███ |
| System Studies & Simulations, Inc. (S3) | Unacceptable | Satisfactory Confidence | Outstanding | $175,660,367.00 | Not Evaluated | Yes | Yes |

AR 2770. With respect to Factor 1 (Technical Capability), the Army assigned the offerors the following numbers of strengths, weaknesses, significant weaknesses, and deficiencies:

| Offeror | Rating | Strength Total | Weakness Total | Significant Weakness Total | Deficiency Identified | Uncertainty Identified |
|---------|--------|----------------|----------------|----------------------------|----------------------|------------------------|
| Amentum | Unacceptable | 2 | 2 | 0 | 1 | 0 |
| CAE | Acceptable | 3 | 1 | 0 | 0 | 0 |
| DigiFlight | Unacceptable | 0 | 1 | 2 | 1 | 0 |
| ████████ | ████████ | █ | █ | █ | █ | █ |
| S3 | Unacceptable | 0 | 0 | 0 | 2 | 0 |

AR 2521. Additional detail regarding the offerors' evaluations follows.

A.  The Army's Evaluation of CAE's Technical Approach

The Army explained that CAE received an "Acceptable" rating because "they demonstrated a thorough understanding and approach to performing the requirements of the solicitation and PWS." AR 2775. As reflected above, the Army assigned CAE three strengths and one weakness for its Technical Approach. AR 2778.

Citing CAE's demonstrated support of "52 surges since 2021," the Army assigned CAE its first strength for "demonstrated ability to meet surge requirements." *Id*. CAE's second strength was for "████████████████████████████████████████ ████████████████████████" *Id*. CAE earned its final strength for its PM and APM exceeding the PWS requirements for their positions. *Id*.

CAE's sole weakness was that its ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ AR *Id*. "This increases the risk of unsuccessful performance for the Optional Surge CLINs." *Id*.

B.  The Army's Evaluation of DigiFlight's Technical Approach

The Army explained that DigiFlight received an "Unacceptable" rating because "they demonstrated a flawed understanding of and inability to perform the requirements of the solicitation and PWS" given its assignment of one weakness, two significant weaknesses, and one deficiency. AR 2779.

DigiFlight's weakness was attributable to a ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████



*Id.*

DigiFlight received its first significant weakness ███████ ████████████████████ " *Id*. The Army questioned whether the ████████████████████ *Id.*

The second significant weakness was ███████ ████████████████████ *Id.*

Finally, DigiFlight had a deficiency because its proposed APM did not meet the PWS 1.5.9.1.1. requirement of a minimum of four years' experience in planning, directing, coordinating, monitoring, and managing contracts specifically related to aviation training programs. AR 2783. Given the lack of requisite experience, the Army found that "[t]he risk to the government is the inability for DigiFlight to properly complete the contract specifics as outlined as the APM's responsibilities throughout their Proposal." *Id.*

C.  The Army's Evaluation of Amentum's Technical Approach

Amentum received an "Unacceptable" rating in Factor 1 "because they demonstrated a flawed understanding of and inability to perform the requirements of the solicitation and PWS." AR 2770-71. The Army found an unacceptable risk of unsuccessful performance due to the assignment of one deficiency and two weaknesses. AR 2771. Although Amentum had two strengths, the Army found they did not "overcome the noted deficiency and weaknesses." *Id.*

With respect to the first weakness, the Army determined that Amentum's "proposed approach to surge support is inadequate and increases the risk of unsuccessful performance." AR 2774. Amentum proposed to ████████████████████ to 'provide immediate surge support.'" *Id*. The Army's evaluation noted that Amentum's reliance on

█████████████████████████████████████████████████████ to provide up to █ days of short-term surge support increases the risk of unsuccessful performance," and recognized that Amentum maintains "an average ██████████████, from requisition to first day on the job." *Id.*

For the second weakness, the Army determined that Amentum proposed an insufficient number of personnel to account for normal or routine personnel absences and vacancies, pursuant to PWS 5.4.3, raising the risk that they would be unable to execute the training schedule. *Id.* The Army determined that Amentum's own "proposed number of personnel for the AH-64E IP and CH-47F NE NRCM labor categories are less than what [Amentum] itself has determined is required to ensure successful performance during normal or routine absences and vacancies." *Id.* Additionally, although Amentum's proposed surge staffing met the minimum surge staffing requirements of PWS 5.4.6, "it was not sufficient to 'maintain enough qualified personnel to perform all required services during normal or routine personnel absences and vacancies,' as required by PWS 5.4.3." *Id.* The Army also determined that Amentum did not propose the required █ percent variance for the staffing ratio for the AH-64E IP and CH-47F FE NRCM labor categories. *Id.* The "minimum number of personnel" of IPs for the AH-64E is 55 full-time employees (FTEs), and a █ percent variance would be █ FTEs, but Amentum only proposed █ FTEs. *Id.* Likewise, the CH-47F FE NRCM daily training requirements is 20 FTEs, and a █ percent variance would be █ FTEs, but Amentum proposed only █ FTEs. AR 2774-75. The Army explained that "[i]ndividually, these variances create moderate risks of unsuccessful performance but when combined create a significant risk for unsuccessful performance overall." AR 2775.

Finally, the Army determined that Amentum's proposal had a deficiency. To wit, the Army explained that Amentum proposed that "if an individual is placed on sick or medical leave as appropriate and is unable to perform flight duties, ███████████████ ██████████████████████████ until such time as the Instructor Pilot's medical grounding status ends or their Annual Evaluation date expires." *Id*; *see* AR 844. The Army found that this term in Amentum's proposal was not in accordance with PWS 1.5.11, which states that personnel will enter the non-qualified workforce anytime they are unable to medically maintain fight duty capabilities in the aircraft. AR 2775; *see also* AR 659-60.

### D. The Army's Evaluation of S3's Technical Approach

S3's proposal received two deficiencies, resulting in an "Unacceptable" rating in Factor 1. AR 2790. The Army assessed the first deficiency for S3's approach to handling surge/contingency operations. AR 2792-93. Specifically, the Army found that S3 did not propose enough CH-47F FEs to support the surge requirement set forth in PWS 5.4.6 of 5 aircraft at a "1:2 = 1 aircraft per 2 Flight Engineers" ratio. AR 2793. Although the Army determined that all other staffing requirements for surge/contingency operations met the minimum requirements of PWS 5.4.6, the Army also noted that the proposed staffing was "not sufficient to account for routine personnel absences and vacancies" in accordance with PWS 5.4.3. *Id.*

S3's second deficiency arose from its daily support capability staffing for the CH-47F FE requirement. *Id*. The Army explained that, though PWS 5.4.2 set a requirement for 10 aircraft at a 1:2 aircraft:FE sets ratio, S3 proposed multiple times that they will only have ▮ CH-47F FEs to meet the 10 aircraft requirement. *Id*. The Army determined that, not only is "[t]his is not enough CH-4&F FEs to support" the requirement, but that the proposed staffing approach also failed to address routine absences or surge requirements. *Id*.

E.   Award Decision

On August 22, 2024, the Source Selection Advisory Council (SSAC) convened to review the final evaluation results of the Source Selection Evaluation Board (SSEB) Chair Report. AR 2765-66; *see also* AR 2665-2760. The SSAC found that the proposal submitted by CAE was the "only acceptable offer; therefore, a comparative analysis was not conducted." AR 2766. The SSAC recommended that the Source Selection Authority (SSA) make award to CAE without discussions because CAE "submitted the highest rated and merited proposal that represents the best value to the Government." *Id*.

On August 28, 2024, the SSA concurred with the SSAC's recommendation to award to CAE without discussions. AR 2845. The Source Selection Decision Document (SSDD) explained:

> I concur with the SSAC's recommendation to award to CAE USA, Inc. without discussions. I have determined it is not in the best interest of the Government to conduct discussions because initial evaluations concluded, only one (1) Offeror, CAE USA, Inc., was determined to be technically 'Acceptable' and whose price was determined to be fair and reasonable. Also, I considered time and fiscal constraints in determining the viability of discussions and concluded that an award to the technically acceptable offeror whose price was fair and reasonable represented the best value and best business decision for the Government.

*Id*. The SSA determined to make award to CAE "in the amount of $182,409,260.00 for the base period of performance (including phase-in) and four (4) option periods." *Id*. On August 29, 2024, the Army awarded the contract to CAE. AR 3597.

IV.   **The Bid Protest**

Three disappointed offerors protested the award decision. S3 Compl., Case No. 24-1429, ECF 1; DigiFlight Compl., Case No. 24-1467, ECF 1; Amentum Compl., Case No. 24-1496, ECF 1. They request a permanent injunction prohibiting the Army from proceeding with the performance of the contract awarded to CAE and directing that the Army re-evaluate proposals and make a new award determination. *See* ECF 36 at 41-42;

ECF 37 at 40-43 ECF 39 at 33-36. Given the directly-related nature of the three cases, the Court directed that all three cases be consolidated for further proceedings. ECF 23, 27. On October 30, 2024, all three Plaintiffs filed motions for judgment on the administrative record. ECF 36, 37, 39. On November 27, 2024, the Government and Intervenor both filed cross-motions for judgment on the administrative record. ECF 46, 47.

## LEGAL STANDARDS

Plaintiffs allege jurisdiction under the Tucker Act. S3 Compl. ¶ 2; Amentum Compl. ¶ 11; DigiFlight Compl. ¶ 6. The Tucker Act, 28 U.S.C. § 1491, confers jurisdiction on this Court to render judgment on "an action by an interested party objecting to … the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

The Court reviews a bid protest action under the standards set forth in Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *see NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004) (stating that APA standard of review is applicable in bid protest context). The APA provides that an agency's decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) (citing 5 U.S.C. § 706(2)). "The arbitrary and capricious standard applicable here is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc*., 419 U.S. 281, 285 (1974)). In reviewing procurement decisions, the Court should not substitute its judgment for that of the agency. *See R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1322 (Fed. Cir. 2003).

To prevail in a bid protest, a plaintiff must demonstrate that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed. Cir. 2001). "When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* at 1332. "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (internal quotation marks and citations omitted). In contrast, "[w]hen a challenge is brought on the second ground, the disappointed bidder must 'show a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* at 1333.

If an error is found in the procurement, the APA instructs that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted) ("[T]o prevail in a protest the

protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). A bid protester is prejudiced if "there was a substantial chance it would have received the contract award but for the" challenged action. *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013)

Procedurally, this bid protest is before the Court pursuant to Court of Federal Claims Rule 52.1(c), which provides for judgment on the administrative record. Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (discussing judgment on the administrative record pursuant to Rule 56.1, the predecessor to today's Rule 52.1).[2]

Lastly, Rule 12 governs the presentation of defenses. Rule 12(b)(6) permits the Court to dismiss an action for failure to state a claim upon which relief may be granted.[3] Dismissal is proper under Rule 12(b)(6) "when a complaint does not allege facts that show the plaintiff is entitled to the legal remedy sought." *Steffen v. United States*, 995 F.3d 1377, 1379 (Fed. Cir. 2021). The Court "must accept as true all the factual allegations in the complaint and … must indulge all reasonable inferences in favor of the non-movant." *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1274 (Fed. Cir. 2023) (quoting *Conti v. United States*, 291 F.3d 1334, 1338 (Fed. Cir. 2002)).

## DISCUSSION

In this post-award bid protest, Plaintiffs assert several perceived errors in the AHFTS procurement. The Court addresses the common issues first, then turns to the parties' unique arguments regarding the Army's evaluation of their respective proposals and subsequent award decision.

### I.    Plaintiffs' Arguments Concerning Discussions Fail

#### A.    Per *Oak Grove*, Plaintiffs Waived Their Collective Challenge to the Army's Decision Not to Hold Discussions

As a general matter, all three Plaintiffs challenge the Army's decision not to hold discussions. ECF 36 at 18; ECF 37 at 19; ECF 39 at 17. Specifically, they allege that the Army violated Defense Federal Acquisition Regulation Supplement (DFARS) § 215.306(c), which provides that "[f]or acquisitions with an estimated value of $100 million

---

[2] Rule 56.1 was abrogated and replaced by Rule 52.1 effective June 20, 2006. *See* Rules Committee Note to Rule 52.1.

[3] Court of Federal Claims Rule 12(b)(6) is the same as Federal Rule of Civil Procedure 12(b)(6). *Compare* RCFC 12(b)(6) *with* Fed. R. Civ. P. 12(b)(6).

or more, contracting officers *should* conduct discussions." (emphasis added).[4] ECF 36 at 18; ECF 37 at 19; ECF 39 at 18.

In *Oak Grove Technologies, LLC v. United States*, the Federal Circuit considered a similar case in which a disappointed bidder argued that the agency violated DFARS § 215.306(c) by failing to hold discussions. 116 F.4th 1364 (Fed. Cir. 2024). Rather than reach the merits of the argument, the Federal Circuit concluded that the plaintiff waived the issue, consistent with the Court's holding in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). *Id.* at 1377.

In *Blue & Gold*, the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313. The Federal Circuit also explained that "where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government." *Id.*

"A defect in a solicitation is patent if it is an obvious omission, inconsistency, or discrepancy of significance. Additionally, a defect is patent if it could have been discovered by reasonable and customary care." *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020) (internal citation omitted). Similarly, a patent ambiguity is present when the solicitation contains facially inconsistent provisions that would place a reasonable offeror on notice and prompt the offeror to rectify the inconsistency by inquiring of the Government. *See K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018).

In *Oak Grove*, the Federal Circuit considered whether the Army's intent not to hold discussions in a procurement—and thus, the alleged violation of the DFARS provision— was obvious or could at least have been discovered by reasonable and customary care. 116 F.4th at 1378. Given that "multiple portions of the Solicitation informed the bidders that

---

[4] S3 concedes that DFARS 215.306(c)(1) does not mandate discussions and attempts to salvage its case by casting its argument as a challenge to the Army's post-proposal justification and decision rather than a challenge to the Solicitation itself. S3 Am. Compl. ¶ 26, ECF 38; ECF 49 at 7-8. Put another way, S3 maintains that its challenge is in response to "the Army's irrational explanation for awarding without discussions, not the lack of discussions alone." ECF 49 at 8. However, the crux of S3's argument arises from the Army's decision to forego discussions. *See, e.g.,* S3 Am. Compl. at 11 ("Count One – rather the Army's decision not to conduct discussions was irrational and contrary to law."); S3 Am. Compl. ¶ 40 ("if the Army had engaged in discussions, S3 would have stood a substantial chance of award"); ECF 39 at 8 (presenting the question of whether the Army "unreasonably failed to hold discussions dispute [sic] the regulatory discretion that it 'should' do so"); ECF 39 at 17 ("Section I below challenges the Army's unreasonable decision not to have discussions."). These statements demonstrate that S3 takes issue not just with the Army's allegedly deficient *explanation* for awarding without discussions, but with the underlying decision to forego discussions.

discussions would not be held," the Federal Circuit deemed the alleged error obvious and held that the protester's failure to protest the Army's intent not to conduct discussions foreclosed its opportunity to challenge that issue at the Court of Federal Claims under the *Blue & Gold* waiver rule. *Id*. In support of this finding, the Federal Circuit explicitly cited: (1) the solicitation's incorporation of FAR § 52.215-1 without its Alternate I; (2) the solicitation's declaration that "[t]he Government does not intend to hold discussions, but reserves the right to do so"; and (3) the solicitation's warning "that the award may not necessarily be made to the lowest priced offeror and that award may be made without discussions." *Id*. In light of these provisions, the Federal Circuit found that "Oak Grove's contention—that the Army's decision not to hold discussions violated DFARS §215.306(c)—was obvious from the Solicitation itself and had to have been raised before the close of the bid process." *Id*.

The case here is similar. Like in *Oak Grove*, the Solicitation incorporated FAR § 52.215-1, without its Alternate I. AR 485. *Compare* FAR § 52.215-1(f)(4) ("The Government intends to evaluate proposals and award a contract *without discussions* . . . ." (emphasis added)) *with* FAR § 52.215-1, Alternate I (f)(4) ("The Government intends to evaluate proposals and award a contract *after conducting discussions* . . . ." (emphasis added)). Further, although the Solicitation indicated that the Government "intend[ed] to conduct discussions in accordance with DFARS § 215.306(c)(1)," AR 649, the very next sentence expressly stated that "the Government may choose to award *without discussions*." *Id*. (emphasis added). Elsewhere in the Solicitation, the Army repeatedly emphasized that award might be made without discussions. *See* AR 709 ("The offeror is reminded that the Government reserves the right to award this effort based on the initial proposal, as received, *without discussion*.") (emphasis added); *see also id*. (providing that "[s]hould the *Government open discussions*, the acceptance period may be extended") (emphasis added); AR 710 (Section 1.2.10 referring to different "submission requirements or discussion response instructions *if* discussions are opened") (emphasis added).

Read together, these provisions put offerors on notice that the Army might make the award without discussions. As such, the potential violation of DFARS § 215.306(c) was obvious from the Solicitation itself or at least could have been discovered by reasonable and customary care. *See Oak Grove*, 116 F.4th at 1378. The issue thus had to have been raised before the close of the bid process to avoid waiver. *See id*. The offerors did not do so.

Moreover, to the extent the provisions in the Solicitation gave rise to a patent ambiguity rather than a patent defect, the protesters ignore any duty on their part to seek clarification. *See Blue & Gold*, 492 F.3d at 1313; *see also NVT Techs., Inc.*, 370 F.3d at 1162 ("If an ambiguity is obvious and a bidder fails to inquire with regard to the provision, his interpretation will fail."). Given the Solicitation's facially competing representations concerning the Army's intent to hold discussions, the offerors had a duty to inquire. *See Blue & Gold,* 492 F. 3d at 1313. They did not do so. Accordingly, by application of the *Blue & Gold* rule—and consistent with the Federal Circuit's holding in *Oak Grove*—the

14

Court finds that Plaintiffs waived their arguments relating to the Army's failure to hold discussions as contemplated by DFARS § 215.306(c)(1).

Still, Plaintiffs attempt to distinguish this matter from the recent, binding holding of *Oak Grove*. Foremost, they argue that *Oak Grove* is inapposite given the Solicitation's stated intent to conduct discussions in accordance with DFARS § 215.306. *See, e.g.*, ECF 39 at 24-25; ECF 36 at 24-25; ECF 37 at 19 n.4; ECF 49 at 10; ECF 51 at 6; ECF 52 at 14. This argument is unpersuasive. First, it ignores the Solicitation's facially competing representations concerning discussions (including the incorporated FAR regulation that heavily factored into the *Oak Grove* decision). Here, the plain text of the provisions in the Solicitation provides both that the Army *intends and does not intend* to hold discussions. *Compare* AR 649 ("The Government intends to conduct discussions in accordance with DFARS 215.306(c)(1)") *with* FAR § 52.215-1(f)(4) ("The Government intends to evaluate proposals and award a contract without discussions.") (incorporated at AR 485). The plainly contradictory intent evinced by these provisions represents a significant, obvious inconsistency that qualifies as a patent defect. *See Inserso*, 961 F.3d at 1349 ("A defect in a solicitation is patent if it is an obvious . . . inconsistency"). These facially inconsistent provisions likewise qualify as a patent ambiguity. *See K-Con,* 908 F.3d at 722 (recognizing that facially inconsistent provisions present a patent ambiguity). As such, the existence of certain language demonstrating an affirmative intent to conduct discussions does not remove this case from *Oak Grove*. Second, the protesters conveniently ignore the fact that *Oak Grove*'s finding of waiver hinged largely on the inclusion of the same or almost identical provisions. For example, the reference to FAR § 52.215-1 without Alternate I was a factor discussed in *Oak Grove*, as was language that expressly reserved the Army's discretion to award without discussions. *See Oak Grove*, 116 F.4th at 1378. Just as those provisions were enough to find that the alleged violation of the DFARS provision was obvious from the face of the solicitation in *Oak Grove*, here too they evince a potential violation of DFARS § 215.306(c) that is obvious from the Solicitation itself. *See* AR 485, 649-50, 709.

The Court is likewise unconvinced by the parties' invitation to treat the facially conflicting provisions as a latent ambiguity rather than a patent one. For example, both DigiFlight and Amentum argue that, to the extent an ambiguity exists, it is latent because it is buried within a laundry list of clauses incorporated by reference and thus is not apparent on the face of the Solicitation. ECF 51 at 11-12; ECF 52 at 17-18. But to accept this argument is to ignore the incorporated FAR provision, and the Court would be hard pressed to find that an inconsistency caused by an explicitly incorporated FAR provision represented "a hidden or concealed defect" that could not be discovered by reasonable and customary care. *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016); *M.R. Pittman Grp., LLC v. United States*, 68 F.4th 1275, 1284 (Fed. Cir. 2023) ("[T]he incorporation of a FAR clause created an ambiguity that a reasonably diligent contractor would seek to clarify."). Clauses incorporated by reference are "effectively part of the host document as if it were explicitly contained therein," *CSI Aviation, Inc. v. Dep't of Homeland Sec.*, 31 F.4th 1349, 1355 (Fed. Cir. 2022), and recently, the Federal Circuit

has twice cited incorporated-by-reference FAR provisions in finding defects or ambiguities patent. *See Oak Grove*, 116 F.4th 1378 (discussing incorporation of FAR § 52.215-1); *see also M.R. Pittman Grp.*, 68 F.4th at 1283 (discussing incorporation of FAR § 52.219-6). Moreover, such a challenge ignores the offerors' obligation, as sophisticated and experienced Government contractors, to thoroughly read the Solicitation and have awareness of its requirements. *See Inserso*, 961 F.3d at 1350 ("Offerors in a government solicitation are 'charged with knowledge of law and fact appropriate to the subject matter'").

Equally unavailing are the protesters' efforts to distinguish *Oak Grove* by appeals to harmonize the Solicitation's plain language and find that the Solicitation contained no error or ambiguity. *See* ECF 49 at 11-12; ECF 51 at 9-11. For example, S3 argues that, because neither the Solicitation's full-text discussions section nor FAR § 52.215-1 commit the Army to discussions, the plain text of both provisions may be read together to simply mean that the Army may, or may not, hold discussions. ECF 49 at 11-12. However, the Court fails to see how it can effectively harmonize two diametrically opposed statements of intent. Again, *compare* "The Government intends to conduct discussions in accordance with DFARS 215.306(c)(1)," AR 649, *with* FAR § 52.215-1(f)(4) ("The Government intends to evaluate proposals and award a contract without discussions" ) (incorporated at AR 485). Although it is true that both provisions leave the Army discretion to decide whether to hold discussions or not, the Army cannot simultaneously intend and not intend to award without discussions.

Invoking principles of contract interpretation, DigiFlight and Amentum's attempts to interpret the Solicitation's provisions in such a way as to avoid ambiguity fare no better. To be sure, "an agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony." *Air-Sea Forwarders, Inc. v. United States*, 166 F.3d 1170, 1172 (Fed. Cir. 1999). However, as discussed, there is no reasonable way to read the Solicitation's competing statements regarding the Army's intent to hold (or not hold) discussions in harmony. Similarly, both DigiFlight and Amentum argue that Section 2.1.4 of the Solicitation, which states that the government intends to conduct discussions pursuant to DFARS 215.306(c)(1), controls over any conflicting provisions incorporated by reference. ECF 51 at 9-10; ECF 52 at 15-16. Though it is true that "a principle of contract interpretation [is] that a specific contract provision will control over a general contract provision," *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1369 (Fed. Cir. 2005), in this case neither of the conflicting provisions are more specific than the other. Instead, both are directed to the same particular matter and express competing views of the Army's intent to hold or not hold discussions. And although both DigiFlight and Amentum maintain that "a generally accepted rule of contract construction is that the provisions of the contract will govern over conflicting terms in the plans and specifications incorporated by reference," ECF 51 at 9; ECF 52 at 16, neither party cites binding authority for this proposition. Nor does either party acknowledge that this Court has previously identified patent ambiguities or errors in solicitations that arose from conflicts between main solicitation text and incorporated provisions. *See, e.g.*, *Rocky*

*Mountain Mobile Med. v. United States*, 153 Fed. Cl. 284, 286 (2021). The Federal Circuit has likewise acknowledged that "the incorporation of a FAR clause [may] create[] an ambiguity that a reasonably diligent contractor would seek to clarify." *M.R. Pittman Grp.*, 68 F.4th at 1284 (deeming a missing NAICS code from a solicitation's text a patent omission when considered alongside an incorporated FAR provision).

Finally, S3 attempts to avoid waiver by framing its argument as an attack on the Army's supposed failure to articulate a reasonable explanation for its decision, made after the proposal deadline, to forego discussions. The Court finds that any such challenge is necessarily predicated on the Army's obligation to hold discussions. If the parties waived their challenges concerning the Army's obligation to conduct discussions, as discussed above, so too did they waive any arguments based on that condition precedent. Accordingly, any waiver found by this Court necessarily extends not only to arguments that DFARS 215.306 established a presumption in favor of discussions that the Army was required to rebut, but to any arguments that the Army's proffered rationale was insufficient to rebut such a presumption.

For the foregoing reasons, the Court concludes that Plaintiffs waived their arguments relating to the Army's obligation to hold discussions as contemplated by DFARS § 215.306(c)(1). Those allegations are dismissed under Rule 12(b)(6). *See M.R. Pittman Grp.*, 68 F.4th at 1277, 1280 (finding the *Blue & Gold* waiver rule a non-jurisdictional issue that is properly raised on a Rule 12(b)(6) motion).

B.  The Army Did Not Violate 10 U.S.C. § 3303(a)(2) and FAR § 15.306(a)(3)

Separate from the alleged requirement of DFARS § 215.306, DigiFlight alone argues that the Army's decision not to conduct discussions also violated 10 U.S.C. § 3303(a)(2) and its implementing regulation, FAR § 15.306(a)(3). ECF 36 at 25-26.

10 U.S.C. § 3303(a)(2) provides that an agency may award a contract "based on the proposals received, without discussions with the offerors . . . *provided that* the solicitation included a statement that proposals are intended to be evaluated, and award made, without discussions, unless discussions are determined to be necessary." (Emphasis added). Likewise, FAR § 15.306(a)(3) provides that "[a]ward may be made without discussions *if* the solicitation states that the Government intends to evaluate proposals and make award without discussions." (Emphasis added). DigiFlight argues that, in absence of the required language the in the Solicitation, the Army was not authorized to award without discussions. ECF 36 at 25.

Given that Plaintiffs were on notice that the award may be made without discussions, the Federal Circuit's holding in *Oak Grove* forecloses DigiFlight's challenge, for the same reasons discussed above. *See Oak Grove*, 116 F.4th at 1378. Even if such challenge was not waived, however, this argument still fails for the simple reason that

DigiFlight ignores the Solicitation's express incorporation of FAR § 52.215-1, AR 485, which provides, in relevant part:

> The Government intends to evaluate proposals and award a contract *without discussions* with offerors (except clarifications as described in FAR 15.306(a)). Therefore, the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint. The Government reserves the right to conduct discussions *if the Contracting Officer later determines them to be necessary*.

FAR § 52.215-1(f)(4) (emphases added). *Assuming arguendo* that 10 U.S.C. § 3303(a)(2) and FAR § 15.306(a)(3) impose an affirmative requirement to include an explicit statement notifying offerors that "the Government intends to evaluate proposals and make award without discussions," FAR § 15.306(a)(3), the Court fails to see how the incorporated FAR provision failed to do just that.

## II.    Plaintiffs Have Not Demonstrated Prejudicial Error in this Procurement

Apart from the issue of flawed discussions, two of the three protesters also raise challenges related to the Army's evaluation of proposals and subsequent award decision.[5] "Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 219 (2020). "Where an evaluation is challenged, [the Court] will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion." *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

In undertaking this assessment, the Court recognizes that "[i]t is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." *Transatlantic Lines, LLC v. United States*, 122 Fed. Cl. 624, 631 (2015), *aff'd*, 644 F. App'x 1024 (Fed. Cir. 2016). Accordingly, "an agency's decision, especially regarding a technical evaluation, is afforded great weight." *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 289 (2007). This is because "technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Indeed, the "evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." *Sys. Application & Techs., Inc. v. United*

---

[5] S3 has withdrawn its challenges concerning the Army's technical evaluation of S3's surge staffing and allegedly disparate treatment. *See* ECF 49 at 6 n.2.

*States*, 100 Fed. Cl. 687, 718 (2011). Under this highly deferential standard, the Court reviews DigiFlight and Amentum's technical challenges in turn.

    A. Amentum's Technical Challenges Fail

Amentum argues that the Army's evaluation of its proposal was "deeply and fundamentally flawed" due to the assignment of one deficiency and two weaknesses that were arbitrary, capricious, and inconsistent with the Solicitation's express terms. *See* ECF 37 at 8-9; *see also* ECF 37 at 25. Because the Solicitation defines a technical rating of Unacceptable to include any single deficiency, *see* AR 651, Amentum must prevail on its deficiency challenge in order to prevail in this protest.

        a. *The Deficiency the Army Assigned to Amentum's Proposal was Rationally Assessed*

First, Amentum takes issue with the Army's assignment of a deficiency to Amentum's proposal for not relegating instructors on sick leave and unable to perform in-air flight training to the "non-qualified workforce." ECF 37 at 8, 17. Amentum had proposed that instructors who "have been given any medication, drugs, or treatment from a civilian physician which restricts them from flying duties . . . ███████████████ ███████████████████████████ until such time as the [IP]'s medical grounding status ends or their Annual Evaluation date expires." AR 843-44, 2775. The Army deemed this proposal not in accordance with PWS 1.5.11. AR 2775.

The plain language of PWS 1.5.11 provides that personnel will enter the non-qualified workforce "any time they are unable to medically maintain flight duty capabilities in the aircraft." AR 659-60. Individuals relegated to the non-qualified workforce are not allowed to perform contract duties. *See* AR 664. Contrary to Amentum's position, the PWS does not distinguish between ████████████████████—rather, it demands the relegation of all individuals "unable to medically maintain flight duty capabilities" to the non-qualified workforce. AR 659-60.

Amentum maintains that "neither the [Solicitation], published guidance by the [FAA] on the use of [over the counter (OTC)] medicines, nor common sense, mandate[s] such a result." ECF 37 at 8. However, these arguments are unpersuasive.

First, although Amentum attempts to frame its argument solely in terms of flight instructors temporarily grounded due to the use of OTC medications, *see Id*. at 28-29, this framing ignores that Amentum's proposal does not just refer to minor illnesses or injuries requiring OTC medications. Instead, the proposal referred to all instances in which an IP receives medication, drugs, or treatment from a civilian physician which restricts them from flying duties. *See* AR 843.

Second, Amentum argues that the last sentence of PWS 1.5.11 should be read in context and is only designed to address a crew member's loss of a requisite medical certification. *See* ECF 37 at 28-31; ECF 52 at 23. Amentum correctly notes that the Court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and

gives reasonable meaning to all its provisions." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). However, the entirety of PWS 1.5.11 may be read together without adopting Amentum's preferred interpretation. Just because the immediately preceding sentence concerns maintenance of medical certifications does not mean the broad, sweeping language in the next sentence must be read only to apply to individuals who cannot fly due to the loss of a required credential. The plain language of the final sentence of PWS 1.5.11 does not differentiate between employees who cannot fly due to common medical leave and those who cannot fly due to the loss of a medical certificate, and the title of the relevant PWS section (Medical Standards) can be reasonably read to encompass more than just credentialing. *See* AR 659-60. Given these facts, as well as the significant deference afforded to an agency's technical evaluation, the Court cannot say that the agency lacked a rational basis for its determination. *See Impresa*, 238 F.3d at 1332.

Amentum's argument that the Army's assigned deficiency is inconsistent with the Solicitation's definition of "non-qualified workforce" at PWS 2.1 fares no better. PWS 2.1 defines the "non-qualified workforce" as "[p]ersonnel that may be undergoing remedial training, extensive recurrence training, or Government-provided training or support that does not allow them to perform the duties outlined in the contract in the contract delivery requirement." AR 664. Amentum argues that this qualification "[i]s reserved for situations in which the employee had lost his/her flight credentials or certifications—*i.e.*, personnel who need 'remedial training, extensive recurrence training, or Government-provided training or support' before they are once again qualified to provide instruction" and does not extend to instructors who have been given medication, drugs, or treatment from a civilian physician. ECF 37 at 30. But Amentum does not cite—and the Court is not aware of—any limitation barring the assignment of others to such status. And since the plain language of PWS 1.5.11 provides that personnel will enter the non-qualified workforce "*any time* they are unable to medically maintain flight duty capabilities in the aircraft," AR 659-60 (emphasis added), the Court cannot conclude that the Army lacked a rational basis when it concluded that Amentum's proposal to allow medically grounded employees to ███████████████████████████████████████████████████████████. Instead, the Court finds that the Army's assignment of this deficiency was consistent with the plain language of the Solicitation and supported by the record. Accordingly, the Army's assessment of a deficiency for this aspect of Amentum's proposal was not arbitrary and capricious, and the Court will not disturb it.

### b.  Amentum Cannot Show Prejudice for its Assigned Weaknesses

In addition to the discussed deficiency, Amentum also challenges the assignment of two weaknesses to Amentum's proposal—the first for the purported inadequacy of Amentum's approach to surge support, and the second for an alleged insufficient number of personnel to account for normal or routine absences. ECF 37 at 17.

The Court need not address these arguments. As explained above, Amentum must show prejudicial error to prevail. *Data Gen. Corp.,* 78 F.3d at 1562. To do so, Amentum

must show that there was a substantial chance it would have received the contract but for the challenged action. *Glenn Defense*, 720 F.3d at 912. Given that the deficiency the Army assigned to Amentum's proposal was rationally assessed (and Amentum waived its discussions arguments), Amentum cannot establish prejudice.[6]

The Solicitation provides that the Army would use an adjectival rating system that defines an Unacceptable technical rating as one where the "[p]roposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high." AR 651. Thus, a single deficiency renders a technical proposal unacceptable. And an offeror whose proposal receives an Unacceptable rating in Factor 1 is ineligible for award. AR 649-50; *see also* AR 651 ("Offerors' proposals must be rated 'Acceptable' or better to be eligible for award."). As a result, no matter how erroneous any other part of the Army's evaluation of Amentum may be, the fact that a deficiency survives the Court's review renders Amentum ineligible for award. Put another way, even if Amentum's arguments regarding its weaknesses were meritorious, Amentum's deficiency remains and removes Amentum from award consideration.

Because Amentum's deficiency was rationally assessed and Amentum cannot establish prejudice for its assessed weaknesses, the Court denies Amentum's MJAR.

## B. DigiFlight's Technical Challenges Fail

Turning to DigiFlight, the Army assessed the company one weakness, two significant weaknesses, and one deficiency. AR 2782-83. In addition to challenging those assignments, DigiFlight also argues that the Army arbitrarily and capriciously credited CAE with strengths while failing to recognize Digiflight's strengths, irrationally excused CAE's adverse past performance as the incumbent as well as an uncertainty concerning CAE's training agreement program, and irrationally evaluated CAE's price against an inaccurate IGCE. *See* ECF 36 at 34.

As with Amentum, the Court begins its analysis with DigiFlight's assigned deficiency, as survival of any deficiency upon this Court's review moots DigiFlight's remaining challenges for want of prejudice.

### a. The Deficiency the Army Assigned to DigiFlight's Proposal was Rationally Assessed

DigiFlight's deficiency stemmed from the perceived lack of experience of its proposed APM. AR 2783. Because evaluators determined that DigiFlight's proposed APM did not possess the "minimum of 4 years of experience in planning, directing, coordinating,

---

[6] Because Amentum waived its challenge to the Army's decision to forego discussions, Amentum cannot argue that its deficiency could have been clarified or revised in discussions or that Amentum could have otherwise improved its defective proposal.

monitoring, and managing contracts specifically related to aviation training programs," as required by PWS 1.5.9.1.1, the Army assigned a deficiency. *Id*.

Without explaining how its proposed APM has experience in the specific tasks of "planning, directing, coordinating, monitoring, and managing contracts specifically related to aviation training programs," as required by the PWS, DigiFlight maintains that its proposed APM met the four-year requirement. ECF 36 at 32. As support for this proposition, DigiFlight points to the "Qualification Summary" section of its proposed APM's resume, which generally summarizes his experience, in relevant part, as follows:

- 26 years' military and commercial contracting experience as a leader, aviation analyst, and director of operations
- 12 years' experience as a Commander Aviation Officer managing and leading aircraft instruction and managing personnel actions
- 7 years' experience managing contractual relationships

*Id*. (citing AR 1263). Notably, although these accomplishments point to longstanding military and contracting experience, none demonstrate that the proposed APM has experience in the specific tasks required by the Army. Even the proposed APM's "7 years' experience managing contracting relationships" doesn't specify that such experience arose from contracts "specifically related to aviation training programs," as required by the PWS. *See* AR 658, 1263. Likewise, although the proposed APM's work as an aviation officer relates to aviation instruction, alone it does not demonstrate the requisite experience "planning, directing, coordinating, monitoring, and managing contracts specifically related to aviation training programs." *See* AR 658. Tellingly, although DigiFlight complains that its proposed APM's "26 years of experience was discounted to less than 4 years," ECF 51 at 23, DigiFlight makes no attempts to explain exactly how its APM actually meets the relevant requirement.

Review of the Professional Experience portion of the proposed APM's resume, which lists specific positions by date and responsibilities, likewise does not mandate a finding that the proposed APM possesses four years of requisite experience. *See* AR 1263-64. Indeed, the record reflects that every individual evaluator identified that DigiFlight's proposed APM did not meet the minimum requirements of the Solicitation, AR 2314, AR 2316, AR 2319, and one specifically noted that the proposed APM's resume "reflects about 20 months of experience per the PWS." AR 2316. Further, the SSDD also notes that the SSA independently concluded that the evaluation was conducted in accordance with the Solicitation, and he adopted the SSEB's findings as his own. AR 2768, 2770. While the SSDD does not explicitly explain why the broad experience of DigiFlight's proposed APM fails to satisfy the PWS requirement of "4 years of experience in planning, directing, coordinating, monitoring, and managing contracts specifically related to aviation training programs," AR 2783, the Court nonetheless "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-*

*Best Freight Sys., Inc.* 419 U.S. 281, 285-86 (1974). Given the insufficient detail in the proposed APM's resume and that the AR indicates an evaluator explained with sufficient specificity the basis for the finding regarding the proposed APM's resume—a finding that was adopted by the SSA—the Court finds that the Army articulated a rationale consistent with the record when it concluded that DigiFlight's proposed APM did not have the necessary "4 years of experience in planning, directing, coordinating, monitoring, and managing contracts specifically related to aviation training programs." AR 2783. The Army's assignment of deficiency was thus not arbitrary and capricious.

### b. *DigiFlight Cannot Show Prejudice for Other Alleged Evaluation Errors*

As discussed, in order to succeed in a post-award bid protest, a plaintiff must demonstrate that it was prejudiced by the errors alleged—i.e., that, but for the errors, the plaintiff had a substantial chance of award. *See, e.g.*, *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *Bannum*, 404 F.3d at 1353.

Here, DigiFlight does not prevail on the merits of its argument challenging its assigned deficiency. As such, the Court finds that its proposal was technically unacceptable and unawardable, pursuant to the terms of the Solicitation. *See* AR 651 (defining an Unacceptable technical rating as one where the proposal contains one or more deficiencies); AR 649-50 (providing that an offeror whose proposal receives an Unacceptable rating in Factor 1 is ineligible for award). The Court's resolution of DigiFlight's challenge regarding its assigned deficiency is thus fatal to the remainder of DigiFlight's claims, as DigiFlight is unable to establish prejudice. Accordingly, the Court denies DigiFlight's MJAR.

### C. S3 Has Abandoned Its Technical Challenges and Cannot Show Prejudice

In addition to the discussions issue addressed above, S3 raised three additional counts in its Amended Complaint. *See* S3 Am. Compl. ¶¶ 41-59. S3 has since withdrawn Counts II and III of its Amended Complaint. ECF 49 at 6 n.2. As such, S3's sole remaining argument is that the Army's "award decision was irrational because it incorporated the irrational decision to award without discussions," causing prejudice to S3. *Id.* at 17. S3 acknowledges that this argument is a "derivative best value challenge about discussions." *Id.*

Even if S3's argument were not derivative of a waived argument (and thus unavailing), S3 no longer challenges the Army's assignment of deficiencies to its proposal. S3's proposal received two deficiencies, resulting in an "Unacceptable" rating in Factor 1. AR 2790. With an unawardable proposal, S3 cannot establish prejudice, as required to prevail. *See Labatt,* 577 F.3d at 1378; AR 651 (defining an Unacceptable technical rating as one where the proposal contains one or more deficiencies); AR 649-50 (providing that an offeror whose proposal receives an Unacceptable rating in Factor 1 is ineligible for award). S3's MJAR is thus denied.

## CONCLUSION

For the foregoing reasons, the Court finds that: (1) Plaintiffs waived their discussions-related challenges; and (2) Plaintiffs have shown no error in the Army's reasonable assignment of deficiencies to their proposals. As such, none of the Plaintiffs can establish prejudice or prevail in this protest and accordingly are not entitled to any relief. Defendant's Motion for Judgment on the Administrative Record (ECF 46) and Intervenor's Motion for Judgment on the Administrative Record and Motion for Partial Dismissal (ECF 47) are thus **GRANTED**. DigiFlight's Motion for Judgment on the Administrative Record (ECF 36), Amentum's Motion for Judgment on the Administrative Record (ECF 37), and S3's Motion for Judgment on the Administrative Record (ECF 39) are **DENIED**. The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

PHILIP S. HADJI
Judge